**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| ALLESANDRO GRAVINA, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 8:19-cv-2993-PX |
| ALEX M. AZAR, II, SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, | * | |
| | * | |
| Defendant. | * | |
| | *** | |

**<u>MEMORANDUM OPINION</u>**

Pending in this employment discrimination case is a motion to dismiss or alternatively for summary judgment filed by Defendant Alex M. Azar, II, Secretary of the U.S. Department of Health and Human Services. ECF No. 14. Plaintiff Allesandro Gravina ("Gravina") has responded, and no hearing is necessary. *See* Loc. R. 105.6. For the following reasons, Defendant's motion, construed as one for summary judgment, is GRANTED. ECF No. 14.

**I.      Background**

On April 3, 2016, Gravina was hired as a Health Communication Specialist in the Division of Health Communication and eHealth ("Division")—a division of the Office of Disease Prevention and Health Promotion ("ODPHP"), within the U.S. Department of Health and Human Services. ECF No. 1 ¶ 19; ECF No. 14-3 at 1. Gravina was responsible for developing, editing, improving, and monitoring content for ODPHP's website, www.healthfinder.gov ("healthfinder"), which is designed for "users with limited health literacy or limited time to search for health information." Dr. Linda Harris, *Syndicated Wellness and Prevention Information for Your Website, Blog, or App from healthfinder.gov*, U.S. Department of Health and Human Services (Jan. 10, 2018), https://health.gov/news/blog/2018/01/syndicated-

wellness-and-prevention-information-your-website-blog-or-app-healthfinder-gov; *see also* ECF No. 14-8; ECF No. 1 ¶ 18.  His specific responsibilities included: (1) developing and maintaining partnerships for syndicating healthfinder content; (2) managing healthfinder's digital media and advertising; (3) auditing and improving the Spanish language content on the healthfinder website; (4) leading the development, monitoring, and reporting of healthfinder metrics; and (5) completing professional development tasks, such as "plain language training" and writing two blog posts.  ECF No. 14-8 at 3–6.

Dr. Linda Harris ("Harris"), the Director of the Division, hired Gravina from a pool of roughly 39 qualified candidates.  ECF No. 14-3 at 1.  His employment was subject to a one-year probationary period, and he reported directly to Harris.  *Id.*; ECF No. 1 ¶ 19.  During his second week on the job, Harris introduced Gravina by email to the entire Division, touting his more than fifteen years of industry experience and adding that he is also a "really nice guy."  ECF No. 14-6.

A.      **Gravina's Work Performance**

Difficulties with Gravina's work centered largely on his writing and editing skills.  One of Gravina's core job duties was producing the Division's internet social media content on health literacy.  ECF No. 14-3 at 2.  Most of the time, contractors with expertise in health literacy provided first drafts of the content.  *Id.*  Gravina was expected to then edit and improve the submission before it was posted online.  *Id.*; *see also* ECF No. 15-20.  To assist him in this respect, Harris gave Gravina time to "familiarize himself with the Division's standards" while he worked under her guidance.  ECF No. 14-3 at 2; *see also* ECF No. 15-1 at 14.  She also directed him to "various evidence-based resources" so he could familiarize himself with the relevant healthcare fields.  ECF No. 14-3 at 2.

Within two months of his hiring, Harris noticed a "pattern of flaws" in Gravina's written

2

work product.  *Id.*  According to Harris, Gravina's emails to outside partners suffered from "belabored and confusing sentences containing convoluted parenthetical phrases, typographic errors, grammatical errors, and syntax errors."  *Id.*  Harris believed her Division in the ODPHP was the "role model for communicating clearly with the public," and thus to her, Gravina's product reflected "unacceptably poor performance."  *Id.*

During the same time period, Gravina also authored his first blogpost for the healthfinder website.  Harris was not pleased.  ECF No. 14-9 at 2–3; ECF No. 15-18.  She advised Gravina that he was making the job "more difficult than [he] need[ed] to," in that he had been "start[ing] from scratch" rather than reusing "what is already written."  ECF No. 14-9 at 2.  She also noted that Gravina's content was "vague and rambling," and needed to be edited with clearer, "actionable" language that gets "straight to the call."  *Id.* at 3.  Harris instructed Gravina to choose a new topic and a simpler theme and to make his draft "have a point of view" with a specific audience in mind.  *Id.*

Gravina thanked Harris for her feedback but defended his work, noting that he was asked to write a blog on men's health without specific guidance.  *Id.* at 1.  Gravina added that for those who have "dedicated their long careers to health issues," writing a blog post is "not complicated" and actually "quite simple."  *Id.*  He admitted that he was not a "fan of recycling the same content time and again" and prefers to "start from scratch," but that he was "happy to follow [her] instructions."  *Id.*

Also around this time, one of the Division's contractors, Sandy Hilfiker ("Hilfiker"), complained to Harris about Gravina's content, specifically the "poor quality of the feedback and edits he provided to them on social media messaging."  ECF No. 14-3 at 2; *see also* ECF No. 14-11.  On September 26, 2016, Hilfiker wrote to Harris that the weekly social media "round up" for

3

which Gravina was responsible consistently required at least two rounds of edits, where previously it had required a single round of editing.  ECF No. 14-11 at 1.  Hilfiker stated that "many" of Gravina's edits were "grammatically incorrect" or reflected that he had not "fully read the content."  *Id.*  In Hilfiker's estimation, Gravina's edits were not "improving the content," and Hilfiker's team was "struggling … to be responsive to [Gravina's] feedback while maintaining quality."  *Id.*

Harris asked Hilfiker for examples of how Gravina's work was falling short of Division standards.  ECF No. 14-12 at 3.  Hilfiker noted three.  First, two weeks earlier, Gravina had overlooked a proposed social media post from the contractor and then asked whether the text could be changed only after the post had been published.  *Id.* at 4.  Second, Gravina had proposed, and the contractor rejected, an edit that would have made the message less clear to readers with limited health literacy skills.  *Id.*  Third, that same week Gravina proposed a single, grammatically incorrect change which the contractor noticed and brought to Gravina's attention, prompting him to admit that he had "misread" the sentence.  *Id.* at 1.  Accordingly, Harris assumed the role of editing posts until Gravina "improve[d] his performance."  ECF No. 14-3 at 2.

On October 21, 2016, Harris administered Gravina's six-month evaluation.  *Id.* at 3; ECF No. 15-5 at 3.  Harris conveyed that Gravina's performance suffered in three areas: quality of work, teamsmanship, and strategic planning.[1]  ECF No. 14-3 at 3; ECF No. 14-16 at 2; ECF No. 14-18.  Going forward, Harris instructed Gravina either to obtain her approval in advance on written content and potential strategic collaborations, or to identify another staff person to serve as a "co-signature" on partnerships currently in development.  ECF No. 14-16 at 2; *see also* ECF

---

[1] It is unclear from the record whether the performance review took place on October 21 or October 28, 2016. *Compare* ECF No. 14-16 at 2 *with* ECF No. 14-3 at 3.

No. 14-3 at 3.  Harris also recommended that Gravina study the healthfinder style guide and, if he so desired, propose edits or changes to it for her review.  ECF No. 14-16 at 2.

Gravina expressed to Harris that he was "very appreciative of the feedback" and "in full agreement [as to how] to proceed."  *Id.* at 2–3.  Gravina also asked for the opportunity to respond to the criticism he had received regarding the social media content.  *Id.*  Gravina submitted a spreadsheet with examples of edits he had made to the contractor's posts.  *See* ECF No. 15-5 at 2; ECF No. 15-6; ECF No. 15-16.  He explained that he usually only proposed one round of edits and that his suggestions were "minor" but "important" and "in line with plain language principles."  ECF No. 15-5 at 2.

Two weeks later, Gravina drafted and submitted for Harris' approval an email to Apple asking for feedback after Apple had declined partnering with the Division's healthfinder tool.  ECF No. 14-17 at 7–8.  Gravina, again, fell short of Harris' expectations.  Harris responded, "please write this i[n] plain language and I'll send."  *Id.* at 7.  Gravina took another crack at it, recycling much of the language used in the first draft, to which Harris wrote back, "go simpler."  *Id.* at 6.  After Gravina shared yet another draft, Harris sent back a revised draft that, as she explained, was "more crisp and readable to someone with limited time."  *Id.* at 5.

That same week, Gravina sought Harris' approval on several edits to the contractor's proposed social media content.  *Id.* at 4.  Gravina wrote to Harris that his edits "ma[d]e a significant difference," and so his lack of authority to make these edits himself was of "great concern" to him.  *Id.* at 2.  Harris replied that his changes did "not add significant value" in that the content did not require immediate correction and that she was trying to help him be more "strategic."  *Id.* at 2–4.  After Gravina thanked Harris for her clarification, Harris wrote, "I appreciate this but am looking forward to the time when you can fly on your own."  *Id.* at 1.

5

In December 2016, Gravina reported to Harris that he was "severely stressed" due to his lack of authority to fully execute on his assigned tasks. ECF No. 14-3 at 4. From Harris' perspective, Gravina had not shown significant improvement by that point, and so Harris was not comfortable with his work being unsupervised. *Id.* Not wanting to put Gravina's health at risk, Harris agreed to transfer the social media task to their colleague, Elizabeth Squire, per Gravina's suggestion. *Id.*; ECF No. 14-16 at 3.

Despite weekly check-ins and "significant attempt[s] to course correct," Harris remained dissatisfied with the quality of Gravina's work in the ensuing months. ECF No. 14-3 at 4. According to Harris, she and others in the Division "spent considerable time and effort editing and sometimes completely rewriting [Plaintiff's] work product." *Id.*; *see also* ECF No. 14-13; ECF No. 14-14.

On March 9, 2017, Gravina received an unsatisfactory year-end evaluation. ECF No. 14-3 at 4–5; ECF No. 14-8 at 1; ECF No. 14-19 at 3. While the evaluation praised Gravina for his "partnership building and promotion of healthfinder," it noted that his writing and editing had failed to improve, prompting his unsatisfactory review in 10 out of the 25 domains across five areas of responsibility. ECF No. 14-19 at 3. In the end, Gravina's total score of 2.88 out of a possible 5 points translated into a less-than-satisfactory overall performance. *Id.*; ECF No. 14-8 at 11.

That same day, Harris terminated Gravina effective March 30, 2017. ECF No. 14-3 at 4–5; ECF No. 14-20. Following the advice of Human Resources, Harris told Gravina that he could submit a resignation letter prior to March 30th in lieu of his termination. ECF No. 14-3 at 5. Harris explains, "[t]his was done only to help Mr. Gravina gain meaningful employment in the future and not have a termination tagged in[] his record." *Id.* Gravina never resigned, and so his

termination became effective on March 30, 2017.  ECF No. 1 ¶ 94.

In response to much of this evidence, Gravina presents a hodgepodge of exhibits for the Court's consideration.  ECF Nos. 15 & 16.  Gravina also asserts general "denials" with no accompanying counter evidence.  *See* ECF No. 15-1 at 9–13, 18, 21–22, 24–27, 30–32.  Gravina further makes unsubstantiated claims about his working relationship with Harris.  *See id.* at 43–46, 51–54.  He maintains that initially he and Harris got along well.  *See id.* at 22, 44–45.  But Harris brought Gravina flowers on several occasions and made comments to him that caused him to feel generally "uncomfortable."  *Id.* at 22, 45.  Harris also "repeated[ly]" mentioned that he was not a native English speaker.  *Id.* at 43.  And during "walking meetings" on their lunch hour, Harris would pepper Gravina with questions about how he had learned English and expressed "disbelief" that he was from a "good family" with "resources."  *Id.*

Gravina also submits for the Court's review a news article that Harris had sent him, which described the dire conditions in his native county, Venezuela.  *Id.*; *see also* ECF No. 15-10.  Gravina describes feeling "belittled and humiliated" upon receiving the article.  ECF No. 15-1 at 43.  Gravina further claims that Harris learned Gravina was gay in September 2016 when Gravina pulled up a Facebook page in Harris' presence that depicted an advertisement for a "Gay Cruise."  *Id.* at 45; *see also* ECF No. 16-6 (claimed advertisement).  According to Gravina, Harris exclaimed "Oh! All boys!" upon seeing the advertisement with a "group of males standing together in close proximity."  ECF No. 15-1 at 45; ECF No. 16-6.  Harris asserts, without detail, that after this incident, his working relationship took a "180-turn."  *Id.* at 45.[2]

---

[2] Curiously, Gravina did not submit a sworn declaration or affidavit supporting his experiences with Harris, even though he ably demonstrated his ability to supply other record evidence beyond the four corners of his Complaint. Strictly speaking, mere averments in pleadings are not evidence, *see Bouchat*, 346 F.3d at 525, and this Court customarily does not consider such averments.  However, for the sake of judicial economy and viewing the record most charitably to Gravina, the Court *infra* explains why these assertions, even if true, do not save the claims.

B.      **Procedural History**

Following his termination, Gravina filed an administrative complaint with the U.S. Equal

Employment Opportunity Commission ("EEOC" or "agency") on May 11, 2017.  ECF No. 14-

22 at 2.   The EEOC conducted an investigation between June 8 and August 11, 2017, and

obtained affidavits from several of Gravina's former colleagues.  *See* ECF Nos. 14-13; 14-14;

14-15.  They described Harris as "supportive" and "professional" and reaffirmed Gravina's

difficulty "writing in plain language and keeping sentences concise."  ECF No. 14-13 at 2; *see*

*also* ECF No. 14-14 at 2 (observing Harris seemed "very supportive" with staff and that

Gravina's writing "typically required several rounds of review and extensive editing"); ECF No.

14-15 at 3 (describing Harris as "well-regarded for her leadership").

The EEOC provided Gravina its report of its investigation on September 11, 2017.  ECF

No. 14-22 at 2.  Gravina requested a hearing before an administrative law judge ("ALJ") on

September 27, 2017, but then withdrew that request on February 8, 2019, prompting the ALJ to

remand the case to the EEOC for a final decision.  *Id.*  The agency dismissed Gravina's claims

on July 9, 2019 and notified Gravina of his right to sue within 90 days of receiving its decision.

*Id.* at 20.  The agency sent notice of its decision to Gravina and to his counsel on July 9, 2019.

*Id.* at 23.  Gravina filed this action on October 14, 2019.  ECF No. 1.

Gravina alleges in the Complaint that he suffered discrimination on account of his race,

national origin, sex, and sexual orientation, and was subjected to a hostile work environment, in

violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. §

2000e–2(a).  *Id.*  Gravina also brought, but has since withdrawn, his claims pursuant to 42 U.S.C.

§ 1981.  ECF No. 15-1 at 49.

## II.        Standard of Review

Defendant has moved to dismiss or, in the alternative, for summary judgment on all claims.  ECF No. 14.  When deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court considers the complaint, as well as documents attached to it that are "integral to the complaint."  *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (citation omitted).  Rule 12(d) provides that, if "matters outside the pleadings are presented to and not excluded by the court" in connection with a Rule 12(b)(6) motion, "the motion must be treated as one for summary judgment under Rule 56," and the parties "must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).

Although formal discovery has not taken place in this action, each party attaches evidence amassed during the EEOC investigation and in support of their respective positions. The Court recognizes that summary judgment is often deferred until parties are given the "opportunity to discover information that is essential to [their] opposition."  *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986)).  Equally true, however, is that "the party opposing summary judgment 'cannot complain'" where no meaningful attempt is made to "oppose the motion on the grounds that more time was needed for discovery."  *Id.* (quoting *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).

Where a nonmovant opposes summary judgment on the grounds that more discovery is needed, he must submit an affidavit or declaration pursuant to Rule 56(d).  *See Hamilton v. Mayor of Balt.*, 807 F. Supp. 2d 331, 341 (D. Md. 2011) (quoting Fed. R. Civ. P. 56(d); citing *Harrods*, 302 F.3d at 244–45).  In it, the nonmovant must explain the additional discovery he

must obtain to defeat the summary judgment motion.  *Id.*  "The purpose of the affidavit is to ensure that the nonmoving party is invoking the protections of Rule 56[d] in good faith and to afford the trial court the showing necessary to assess the merit of a party's opposition."  *Harrods*, 302 F.3d at 244 (quoting *First Chicago Int'l v. United Exchange Co.*, 836 F.2d 1375, 1380 (D.C. Cir. 1988)).  And so even if a nonmovant does not strictly conform to the dictates of Rule 56(d), if he has otherwise "adequately informed the district court that the motion is premature and that more discovery is necessary," courts may treat those objections "as the functional equivalent of a[] [Rule 56(d)] affidavit."  *Id.* at 244–45 (quotations omitted).  But in no circumstance may the nonmovant "simply demand discovery for the sake of discovery."  *Hamilton*, 807 F. Supp. 2d at 342 (quotation omitted).

In this respect, the Fourth Circuit has warned the nonmovant that simply referencing "the need for additional discovery . . . is not an adequate substitute" for a Rule 56(d) affidavit. *Harrods*, 302 F.3d at 244 (quoting *Evans*, 80 F.3d at 961 (quoting *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir. 1994))).  Thus, a "request for additional discovery is properly denied 'where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment.'"  *Hamilton*, 807 F. Supp. 2d at 342 (quoting *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 953 (4th Cir. 1995); citing *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006)).

Gravina has not filed a Rule 56(d) affidavit.  Instead, he has submitted evidence outside the four corners of the Complaint that, in his view, defeats summary judgment.  *See generally* ECF Nos. 15 & 16.  Yet, in a transparent effort to have it both ways, Gravina also argues that summary judgment is premature because facts still "[n]eed to [b]e [e]xplored."  ECF No. 15-1 at 56; *see also id.* at 6 (stating facts "currently demonstrated within the record" remain in dispute).

Gravina falls woefully short of convincing this Court that additional discovery is necessary for his proper opposition to the motion. Thus, the Court will treat it as one for summary judgment.

Under Rule 56(a), summary judgment is appropriate when the Court, viewing the evidence in the light most favorable to the nonmoving party, finds no genuine disputed issue of material fact, entitling the movant to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc*., 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). Importantly, "a court should not grant summary judgment 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'" *Campbell v. Hewitt, Coleman & Assocs., Inc*., 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Sur. Co*., 381 F.2d 245, 249 (4th Cir. 1967)). Where the party bearing the burden of proving a claim or defense "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is warranted. *Celotex*, 477 U.S. at 322.

With this standard in mind, the Court turns to Defendant's arguments. Defendant lodges both procedural and substantive grounds for relief. The Court addresses each separately.

### III.      Timeliness

Defendant contends Gravina filed this action more than 90 days after receiving his right-to-sue letter and thus his claims are untimely.  ECF No. 14-1 at 14.  The Court agrees.

To bring a Title VII action, a plaintiff must first exhaust his administrative remedies by raising the claim with the EEOC.  *See Sloop v. Memorial Mission Hosp., Inc.*, 198 F.3d 147, 148 (4th Cir. 1999).  "Upon completion of the administrative process, the EEOC must give notice to the complainant of the complainant's right to file suit."  *Weathersbee v. Balt. City Fire Dept.*, 970 F. Supp. 2d 418, 426 (D. Md. 2013) (citing 42 U.S.C. § 2000e–5(f)(1)).  This notice is commonly called a right-to-sue letter.  *See id.* (citation omitted).  "A complainant has ninety days to file suit in federal or state court after being notified of the right to sue."  *Id.* (citations omitted).

Title VII's 90-day window "is not a jurisdictional requirement."  *Id.* at 426–27 (citations omitted); *see also Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1849–50 (2019) (finding Title VII's charge-filing requirement is not jurisdictional but a "mandatory claim-processing rule").  However, as the Fourth Circuit has advised, this requirement is "clear evidence that Congress intended to require claimants to act expeditiously, without unnecessary delay."  *Harvey v. City of New Bern Police Dept.*, 813 F.2d 652, 654 (4th Cir. 1987).  Accordingly, the 90-day time limit, if timely and properly raised, is "strictly enforced" and "treated like a statute of limitations."  *Weathersbee*, 970 F. Supp. 2d at 427 (quotation omitted); *see also Fort Bend*, 129 S. Ct. at 1849 (explaining a "mandatory claim-processing rule may be forfeited if the party asserting the rule waits too long to raise the point." (quotation omitted)); *Harvey*, 813 F.2d at 653–54 (holding complaint was untimely where plaintiff sued 91 days after his household received the notice); *Griffin v. Prince William Hosp. Corp.*, 716 F. Supp. 919, 921 (E.D. Va. 1989) ("[T]he 90 day limitations period bars untimely actions absent equitable tolling or exceptional circumstances.");

*Gray-Koyier v. Balt. Cty. Pub. Schs.*, No. MJG-17-1888, 2018 WL 1505789, at *3 (D. Md. Mar. 27, 2018) (quoting *Woodruff v. Peters*, 482 F.3d 521, 525 (D.C. Cir. 2007) ("Courts apply this limit strictly and will dismiss a suit for missing the deadline by even one day.")).

"In the absence of evidence of the [actual] date of receipt, a right-to-sue letter is presumed to have been received by the plaintiff three days after it was issued and mailed," pursuant to Federal Rule of Civil Procedure 6(d). *Weathersbee*, 970 F. Supp. 2d at 427 (citing cases); *see also Smith v. Brennan*, No. PWG-17-3334, 2019 WL 3046108, at *5 (D. Md. July 11, 2019). However, a plaintiff can "rebut this presumption by presenting 'sworn testimony or other admissible evidence from which it could reasonably be inferred either that the notice was mailed later than its typewritten date or that it took longer than three days to reach [him] by mail.'" *Brennan*, 2019 WL 3046108, at *5 (quoting *Weathersbee*, 970 F. Supp. 2d at 427–28).

The record evidence reflects that on July 9, 2019, the EEOC mailed two copies of its notice of termination—one to Gravina at his residence and one to counsel at her law office. ECF No. 14-22 at 23. The notice states that for "timeliness purposes, it shall be presumed that the below-named individuals received the foregoing final agency decision within 5 calendar days after the date it was sent by USPS." *Id.* This five-day period, therefore, marks the presumptive receipt date for both Gravina and his counsel as July 14, 2019. *See Brennan*, 2019 WL 3046108, at *5 (quoting *Weathersbee*, 970 F. Supp. 2d at 427–28).

As for Gravina, no evidence suggests that he received this notice later than July 14. Thus, his presumptive receipt date remains the same. As for his attorney, Gravina submits evidence that she did not receive the notice until July 23, 2019, 83 days before the Complaint was filed. *Compare* ECF No. 15-1 at 38 and ECF No. 15-3 *with* ECF No. 1. Gravina now asks the Court to measure the 90-day period not from his presumptive receipt date but from his

attorney's later received date.  ECF No. 15-1 at 38–39 (citing ECF No. 15-3).

The Court cannot credit Gravina's argument.  The overwhelming authority makes clear that the "90-day limitations period begins running when the agency delivers notice to the plaintiff *or* to the plaintiff's attorney, *whichever comes first*."  *Harris v. Bodman*, 538 F. Supp. 2d 78, 80 (D.D.C. 2008), *aff'd*, No. 08-5091, 2008 WL 5532102 (D.C. Cir. Aug. 27, 2008) (citing cases) (emphasis added); *Seitzinger v. Reading Hosp. & Med. Ctr.,* 165 F.3d 236, 239 n.1 (3d Cir. 1999) (same); *Noe v. Ward,* 754 F.2d 890, 891 (10th Cir. 1985) (same); *McKay v. England*, No. JR-01-2535, 2003 WL 1799247, at *1 (D.D.C. Mar. 27, 2003) (same); *see also Griffin*, 716 F. Supp. at 921 (same); *Harvey*, 813 F.2d at 653–54 (finding receipt of notice by plaintiff's spouse triggered 90-day period); *Weathersbee*, 970 F. Supp. 2d at 428 (citing favorably *Griffin v. Acacia Life Ins. Co*., 151 F. Supp. 2d 78, 80–81 (D.D.C. 2001) (explaining counsel's understanding of the filing deadline did not settle when plaintiff "actually received" the letter)).  This authority likewise treats the presumptive receipt date, absent evidence to the contrary, as the actually received date.  *See, e.g.*, *Weathersbee*, 970 F. Supp. 2d at 427.  Thus, because Gravina received his notice for purposes of the 90-day limitations clock, and this date is indeed earlier than the receipt date applicable to his counsel, the Court must measure the 90-day window from July 14, 2019.  *See id.*; *cf. Schmidt v. Town of Cheverly*, No. GJH–13–3282, 2014 WL 4799039, at *9 (D. Md. Sept. 25, 2014) (citing *Weathersbee*, 970 F. Supp. 2d at 427–28; *see also Gray-Koyier*, 2018 WL 1505789, at *4 (attorney's sworn affidavit and tracking receipt sufficient to rebut presumption under Rule 6(d)); *Brennan*, 2019 WL 3046108, at *5.  Because Plaintiff filed the Complaint on October 14, 2019, 92 days after receipt of his notice, his claims are time-barred.  ECF No. 14-22 at 23; ECF No. 1.

However, even if Gravina somehow could demonstrate that this suit is not time-barred,

he has not generated sufficient evidence to survive challenge on the merits.  The Court next turns
to the absence of evidence supporting his discrimination and hostile work environment claims.

### IV.    Disparate Treatment Claims Based on Race, National Origin, Sex, and Sexual Orientation

Plaintiff lodges a broadside attack on every conceivable kind of adverse employment
action he suffered at ODPHP, and he asserts that all are motivated by race, national origin, sex,
and sexual orientation discrimination.  ECF No. 1 (Counts 1, 2, 3, and 4).   He similarly
maintains to have suffered all manner of harm, to include "lost wages, loss of reputation,
defamation of character, and loss of career opportunity now and in the future, and *all other losses
stated with Plaintiff not contributing in any way thereto*."  *Id.* ¶ 113 (emphasis added).  Plainly,
Gravina's Complaint is so sprawling and disjointed that it is, in many ways, difficult to ascertain
the factual bases for the alleged discrimination.  That said, the Court, guided by Gravina's
response, will frame the claims as he does—that he suffered the "adverse action" of "hav[ing] his
duties removed" and being fired as a result of discriminatory animus.  ECF No. 15-1 at 42.

Title VII prohibits an employer from "discharg[ing] any individual, or otherwise . . .
discriminat[ing] against any individual with respect to his compensation, terms, conditions, or
privileges of employment, because of such individual's race."  42 U.S.C. § 2000e–2(a).  Absent
direct evidence of discrimination, the Court applies the burden shifting framework announced in
*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  First, the plaintiff must
establish a prima facie case of discrimination by demonstrating (1) membership in a protected
class; (2) satisfactory job performance; (3) adverse employment action; and (4) different
treatment from similarly situated employees outside the protected class.  *Coleman v. Md. Ct. of
Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (citing *White v. BFI Waste Servs., LLC*, 375 F.3d
288, 295 (4th Cir. 2004)); *see also Witherspoon v. Brennan*, 449 F. Supp. 3d 491, 500 (D. Md.

2020) (quoting *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007)).

If the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for being stripped of job duties and for his ultimate discharge.  *See Guessous v. Fairview Prop. Invs., LLC*, 828 F 3d. 208, 216–17 (4th Cir. 2016); *Moore v. Mukasey*, 305 F. App'x. 111, 115 (4th Cir. 2008) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993)).  Once the defendant offers such a reason, the burden then shifts back to the plaintiff to raise a genuine dispute as to whether the defendant's proffered reason is mere pretext for discrimination.  *See EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 852 (4th Cir. 2001).  Critically, the plaintiff must show that the defendant's stated reason for taking adverse action "was false, *and* that discrimination was the real reason." *Hicks*, 509 U.S. at 515.

For purposes of this motion, the Court assumes without deciding that Gravina can establish the prima facie case, recognizing that such burden is often "not onerous." *Hartman v. Univ. of Md.*, No. ELH–10–2041, 2012 WL 3544730, at *15 (D. Md. Aug. 14, 2012) (quoting *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 515 (4th Cir. 2006)).  That said, significant evidence demonstrates that Harris reduced Gravina's duties and ultimately terminated him because of his poor job performance.  Furthermore, no evidence exists Harris took such measures on account of his race, national origin, sex, or sexual orientation.

To begin, the record reflects that Gravina's reduction in job responsibilities were well supported.  ECF Nos. 14-9; 14-10; 14-11; 14-12; 14-13; 14-14; 14-16; 14-17; 14-18; 15-6; 15-16; 15-18.  Similarly, when Gravina did not show sufficient improvement, he was let go.  ECF No. 14-3 at 4; ECF No. 14-20.  His formal evaluations remained poor due to chronic issues identified in his writing and despite significant efforts expended toward his improvement.  ECF

Nos. 14-3 at 4; 14-13; 14-14; 14-17; 14-19.  Accordingly, Defendant's stated reason for termination—that Gravina could not perform his job duties at a level commensurate with the position—is well established.

By contrast, no real evidence demonstrates that the stated grounds for Defendant's adverse action were false.  Gravina takes issue with Harris' observation that his emails to external partners lacked sufficient clarity.  ECF No. 15-1 at 11; ECF No. 14-3 at 2.  In particular, he points to Harris having thanked him once for his "eagle eye" in spotting a mistyped email address.  ECF No. 15-17.  The occasional compliment, however, does not rebut the consistent, well documented shortcomings that supported Harris' conclusion as to Gravina's insufficient written work product for the duration of his employment.  *See, e.g.*, ECF No. 14-17.

On the substantive criticisms of his blog post and social media edits (ECF No. 14-1 at 6; ECF No. 14-9), Gravina simply stands by the quality of his writing.  ECF No. 15-1 at 10–13.  But Gravina's own favorable self-assessment does not create a genuine issue of disputed fact as to the legitimate grounds for the adverse employment action.  This is because the "perception of the decision maker [] is relevant, not the self-assessment of the plaintiff."  *Evans*, 80 F.3d at 960–61 (quoting *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980)); *see also* ECF No. 15-18; ECF No. 15-16; ECF No. 15-20.  On this alone, Gravina has failed to demonstrate that the Defendant's stated reasons for the adverse employment actions were false.

Similarly, on whether such stated reasons were a pretext for discrimination, Gravina generates no evidence of discriminatory animus.  Where the "crucial issue" is whether an employer acts with "unlawful discriminatory motive," it is incumbent upon the plaintiff to generate some evidence from which a reasonable trier of fact could conclude he was adversely treated on account of his protected status.  *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 383

(4th Cir. 1995); *see also Propst v. HWS Co., Inc.*, 148 F. Supp. 3d 506, 528 (W.D.N.C. 2015) ("[I]t is not the Court's province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for" the action.).

Gravina asserts that Harris "strategically fabricated" his mid-year performance review in October 2016, and that Harris' criticisms coincided with her learning of his sexual orientation. ECF No. 15-1 at 24.  The Court finds no record evidence of "fabrication," especially in light of many others corroborating Gravina's shortcomings in his job duties.  ECF Nos. 14-11; 14-13; 14-14.  Moreover, the Court finds no evidence tying Harris' adverse actions to her learning of Gravina's sexual orientation.  Rather, the record demonstrates that within two months of his hiring—and well before Harris learned Gravina was gay—Harris had identified significant shortcomings in Gravina's skills.  ECF Nos. 14-9; 14-12; 15-6; 15-18.  Thereafter, Harris repeatedly attempted to address those deficiencies with Gravina but saw little improvement. ECF Nos. 14-3 at 4; 14-17; 14-19.  As for Gravina's claim that he was the victim of some "coordinated effort" to terminate him *unlawfully*, ECF No. 15-1 at 14, the record instead reflects that Harris' assessment of Gravina's shortcomings was simply shared by other coworkers and colleagues.  ECF Nos. 14-12; 14-13; 14-14.  At best, this amounts to a concerted agreement that Gravina could not cut the mustard, not of discriminatory animus.

Gravina attempts to impute discriminatory animus to several of Harris' purported acts, none of which alone or in combination reflect that she reduced his job duties or fired him for illegitimate reasons.  Gravina makes much of Harris having sent him an article about Venezuela and commenting on the clarity of his spoken word.  ECF No. 15-1 at 43.  He also notes that she exclaimed "Oh, All Boys!" upon seeing an advertisement for a gay cruise.  *Id.* at 45.  But even viewed most favorably to Gravina, these stray, perhaps awkward, comments do not reflect an

impetus on Harris' part to terminate Gravina on account of his protected status.  *See Hartman*, 2012 WL 3544730, at *17 (quoting *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999)); *see also Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 300 (4th Cir. 2010).

Lastly, Gravina's discrimination claim is further undercut when considering that "the hirer and the firer [we]re the same individual and [his] termination of employment occur[ed] within a relatively short time span following [his] hiring."  *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991); *see also Bing v. Brivo Sys., LLC*, 959 F.3d 605, 619 n.9 (4th Cir. 2020) (affirming *Proud*).  In this circumstance, "a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer."  *Bing*, 959 F.3d at 619 n.9 (quoting *Proud*, 945 F.2d at 797).

Here, Harris both extended the employment offer to Gravina and then, after much review, efforts at improvement, and re-evaluation, terminated him within the one-year probationary period.  ECF No. 14-3 at 1, 4–5.  Nothing that Gravina puts forward has contravened the inference that Harris acted consistently with her terms for hiring Gravina—that his performance would be measured and assessed during the probationary period, and if his work product fell below acceptable standards, he could be terminated.  Accordingly, the Court grants Defendant's summary judgment motion on the disparate treatment claims.

## V.        Hostile Work Environment

Gravina's hostile work environment claim suffers from similar infirmities.  To establish a hostile work environment, a plaintiff must show that the complained-of conduct was (1) unwelcome; (2) based on a protected characteristic; (3) sufficiently severe or pervasive to alter the conditions of employment and to create an abusive work environment; and (4) imputable to

his employer.  *See Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 495–96 (4th Cir. 2015).

Whether actions amount to a hostile work environment depend on the "frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work

performance."  *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 272 (4th Cir. 2015)

(quotation omitted).  This prong is met when the workplace is "permeated with discriminatory

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of

the victim's employment and create an abusive work environment."  *Id.* at 277 (quotation

omitted).  By contrast, "simple teasing, offhand comments, and isolated incidents (unless

extremely serious) will not amount to discriminatory changes in the terms and conditions of

employment."  *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (quotation

omitted).

When viewing the record evidence most favorably to Gravina, he has pointed to nothing

which reflects that he was subjected to a harsh or abusive *discriminatory* environment.  ECF No.

15-1 at 48–49.  Gravina specifically argues that Harris' allegedly invasive inquiries about his

personal life combined with her intense supervision of his work are enough.  *Id.* at 45.  The

Court disagrees.  Harris' oversight of Gravina's writing is precisely the kind of supervision

expected for management of content-based copyediting.  As to Harris' inquiries into his personal

life and her reaction to his homosexuality, those instances alone or in combination were not so

severe as to alter the conditions of his work environment.  *See Mott v. Accenture, LLP*, No. PX-

17-0231, 2019 WL 1934727, at *17 (D. Md. Apr. 29, 2019) (citing cases).  Gravina's

pronouncements of feeling "uncomfortable" (ECF No. 15-1 at 45), no matter how sincere, do not

alone generate sufficient evidence to save the claim.  Summary judgment is granted in

20

Defendant's favor on the hostile work environment cause of action.

**VI.       Conclusion**

For the foregoing reasons, Gravina's claims are untimely and alternatively fail on the merits.  Defendant's motion, construed as one for summary judgment, is therefore GRANTED. A separate Order follows.


_____3/12/2021_____                                    _____/s/_____
Date                                                            Paula Xinis
                                                                United States District Judge


21